**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF LOUISIANA**

TODD WESSINGER,

Plaintiff,

v.

GARY WESTCOTT, in his official capacity as Secretary of the Louisiana Department of Public Safety and Corrections; SETH SMITH, in his official capacity as Chief of Operations of the Louisiana Department of Public Safety and Corrections; and DARREL VANNOY, in his official capacity as Warden of the Louisiana State Penitentiary.

Defendants.

Civil Action No. 3:26-cv-00957

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## I. NATURE OF ACTION

1. Plaintiff Todd Wessinger brings this action pursuant to 42 U.S.C. § 1983 for violations and threatened violations of his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments to the United States Constitution.

2. Louisiana law permits the use of capital punishment for persons convicted of first-degree murder and sentenced to death by a unanimous jury.

3. The administration of the death penalty in Louisiana is committed to the Louisiana Department of Public Safety and Corrections ("DPSC"). DPSC has set forth the procedures and protocols for the administration of capital punishment in Department Regulation No. OP-D-8, most recently amended on July 13, 2026 ("Execution Protocol" or "Protocol").

4. In 2024, Louisiana authorized nitrogen hypoxia as a method of execution. DPSC thereafter developed and adopted written policies and procedures governing execution by

nitrogen hypoxia. In developing that system and incorporating it into the Protocol, DPSC sought to replicate Alabama's system as closely as possible, reviewed only Alabama's nitrogen-hypoxia protocol, consulted no doctor or other medical professional, and ultimately adopted a protocol that was "almost exactly" Alabama's.

5. Execution by nitrogen hypoxia creates a substantial risk of serious harm and severe pain to Mr. Wessinger. Nitrogen hypoxia kills by depriving a conscious person of oxygen. As oxygen deprivation intensifies, the condemned prisoner experiences severe air hunger—the primal, physical, and intensely distressing sensation of suffocation—before losing consciousness. That suffering is far beyond what is necessary for the mere extinguishment of life and cruelly superadds terror and pain to the sentence of death. The nitrogen executions conducted to date have demonstrated that this risk is neither conjectural nor speculative: condemned prisoners have gasped, struggled, convulsed, and exhibited other signs of severe respiratory distress after nitrogen began to flow.

6. That risk has now been confirmed by federal courts reviewing the very system Louisiana sought to replicate. On June 8, 2026, the Eleventh Circuit held that Alabama's substantially similar nitrogen-hypoxia protocol presented "a substantial risk of serious harm" that was "not conjectural, speculative, or doubtful," specifically relying on findings concerning prolonged air hunger and flash pulmonary edema. The following day, the district court permanently enjoined Alabama from executing Jeffery Lee under that protocol.

7. Further, several defects in Louisiana's Protocol compound the substantial risk of serious harm and severe pain presented by nitrogen hypoxia. Among other things, the Protocol fails to ensure that oxygen is excluded from the nitrogen-delivery system, fails to adequately

address foreseeable complications that may arise during nitrogen administration, and provides no adequate mechanism to monitor and respond if the execution does not proceed as intended.

8. Louisiana's current Protocol also provides for execution by a two-drug series of midazolam and hydromorphone. That combination presents a substantial risk of serious harm to a condemned prisoner. It pairs midazolam, a drug that cannot reliably produce deep anesthesia, with hydromorphone, an opioid that is likely to progressively impair the prisoner's ability to breathe without reliably extinguishing awareness, creating a substantial risk that he will remain conscious while experiencing severe air hunger and the pain, suffering, and terror attendant to that experience.

9. Single-drug pentobarbital is a feasible and readily implemented alternative that would significantly reduce the substantial risk of severe harm presented by execution through nitrogen hypoxia or the two-drug midazolam and hydromorphone series. Louisiana has already adopted the procedures necessary to carry out an execution using single-drug pentobarbital: DPSC's current Protocol expressly provides for obtaining pentobarbital from a manufacturer, distributor, or compounding pharmacy and sets forth procedures for preparing and administering the drug, establishing intravenous access, monitoring the prisoner, and administering additional doses if necessary.

10. Pentobarbital also remains demonstrably obtainable for use in executions. States have continued in recent years to acquire and use pentobarbital for executions, and the Federal Government has committed to assisting States in obtaining the drugs necessary to carry out lethal-injection executions.

11. Use of DPSC's current single-drug pentobarbital protocol would significantly reduce the risk posed by both nitrogen hypoxia and the two-drug midazolam-and-

hydromorphone series because pentobarbital reliably renders a prisoner deeply unconscious before the respiratory and cardiovascular effects that cause death. Unlike nitrogen hypoxia, it does not cause unconsciousness through progressive oxygen deprivation and the severe air hunger, physiological stress, and sensation of suffocation or drowning that results. And unlike the midazolam-and-hydromorphone series, it does not progressively impair breathing or obstruct the upper airway without first reliably producing unconsciousness, creating a substantial risk of conscious suffocation.

12. DPSC has previously asserted that it could not obtain pentobarbital for use in executions without risking the termination of its contract with the pharmaceutical suppliers from whom DPSC obtains drugs for the treatment of individuals in its custody. But like many of the jurisdictions which use the drug in executions, DPSC could obtain pentobarbital from a compounding pharmacy without any negative impact on its existing pharmaceutical supply relationships.

13. Defendants intend to execute Mr. Wessinger by nitrogen hypoxia. On August 18, 2026, the United States Court of Appeals for the Fifth Circuit reversed the grant of habeas relief to Mr. Wessinger by the U.S. District Court for the Middle District of Louisiana and remanded the case to the district court with instructions to enter final judgment denying the petition. Although a petition for rehearing and further litigation is expected, the Fifth Circuit's decision demonstrates that this Complaint presents an actual case or controversy for this Court's adjudication.

14. Defendants' use of nitrogen hypoxia to execute Mr. Wessinger, rather than the feasible and readily implemented alternative of single-drug pentobarbital, would create a

substantial risk of serious harm and severe pain and constitute cruel and unusual punishment prohibited by the Eighth Amendment.

15. The entirety of Louisiana's execution protocol is not at issue in this lawsuit. Rather, this civil action challenges Defendants' use of nitrogen hypoxia and the Protocol's two-drug midazolam-and-hydromorphone procedure to execute Mr. Wessinger.

16. Mr. Wessinger seeks preliminary and permanent injunctive relief to prevent Defendants from inflicting cruel and unusual punishment upon him during his execution.

## II. JURISDICTION AND VENUE

17. Plaintiff's claims arise under the Constitution and laws of the United States. The federal rights asserted by Plaintiff are enforceable under 42 U.S.C. § 1983. This Court has original federal-question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343.

18. This Court has the authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201–2202 and Federal Rules of Civil Procedure 57 and 65.

19. Venue is proper in the Middle District of Louisiana under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred or will occur in this District, including at DPSC headquarters in Baton Rouge, and at the Louisiana State Penitentiary at Angola, where every sentence of death imposed in Louisiana must be executed.[1]

## III. PARTIES

20. Plaintiff Todd Wessinger is a United States citizen, currently incarcerated at the Louisiana State Penitentiary in Angola, Louisiana.

21. Defendant Gary Westcott is the Secretary of the Louisiana Department of Public Safety and Corrections.

[1] La. Rev. Stat. § 15:569(A).

22. DPSC is the state agency charged with the incarceration, care, custody, and treatment of state prisoners, including prisoners sentenced to death.

23. Secretary Westcott is the chief executive officer of DPSC, establishes and administers the policies and procedures of DPSC, and oversees the administration of its affairs. Louisiana law vests the DPSC Secretary with unfettered discretion to select the method by which a sentence of death will be carried out.[2]

24. The DPSC Secretary, or a competent person selected by him, is responsible for executing a condemned prisoner in conformity with the death warrant issued in the prisoner's case.[3]

25. Secretary Westcott is responsible for ensuring that all prisoners committed to the custody of DPSC are treated in accordance with the United States Constitution.

26. At all relevant times, Secretary Westcott has acted and will act under color of law and as the agent and official representative of DPSC, pursuant to DPSC's official policies and procedures. Secretary Westcott is sued in his official capacity only.

27. Defendant Seth Smith is the Chief of Operations of DPSC.

28. Smith was specifically tasked with DPSC's implementation of nitrogen hypoxia as a method of execution and participated directly in the development of Louisiana's nitrogen-hypoxia execution system and Protocol. Among other things, Smith participated in DPSC's examination of Alabama's nitrogen-hypoxia system and DPSC's efforts to replicate that system in Louisiana.

29. Smith's responsibilities concerning executions are ongoing. As Chief of Operations, Smith exercises department-level administrative oversight of DPSC's adult

[2] La. Rev. Stat. § 15:569(A).
[3] La. Rev. Stat. § 15:568.

correctional institutions, including the Louisiana State Penitentiary. Smith has testified that DPSC's implementation of nitrogen hypoxia "falls underneath [his] umbrella" as Chief of Operations. In that capacity, Smith continues to exercise supervisory authority over DPSC's implementation of its execution procedures, including the acquisition of equipment and supplies necessary to carry out executions and DPSC's efforts to obtain drugs for use in lethal injection.

30. At all relevant times, Smith has acted and will act under color of law and as an agent and official representative of DPSC, pursuant to DPSC's official policies and procedures. He is sued in his official capacity only.

31. Defendant Darrel Vannoy is the Warden of the Louisiana State Penitentiary in Angola, Louisiana, the prison where executions take place in the State of Louisiana.

32. Warden Vannoy is responsible for implementing DPSC's policies and procedures governing executions and managing the preparations for an execution.

33. Warden Vannoy is also responsible for protecting the constitutional rights of all persons incarcerated at the Louisiana State Penitentiary and/or transported within the facility for an execution.

34. At all relevant times, Warden Vannoy has acted and will act under color of law and as the agent and official representative of the Louisiana State Penitentiary and DPSC. He is sued in his official capacity only.

## IV. FACTUAL ALLEGATIONS

### A. The Initial Development of Nitrogen Hypoxia as a Method of Execution

35. Despite its scientific-sounding name, "nitrogen hypoxia" as a method of execution was not conceived by scientists or doctors, but by criminal law professors. In 2014, professors at Oklahoma's East Central University co-authored a 14-page paper advocating the

use of nitrogen-gas asphyxiation—which they called "nitrogen hypoxia"—as an alternative to lethal injection. Neither of these authors had any training, experience, certification, or background in medicine or pharmacology.

36. In September 2014, the Oklahoma House of Representatives invited one of the authors, Professor Copeland, a criminal-law professor with no medical background, to present the proposal to the House Judiciary Committee. Five months later, Oklahoma lawmakers introduced legislation authorizing nitrogen hypoxia as a method of execution. The legislation passed without expert review, and Oklahoma became the first state to authorize execution by nitrogen hypoxia.

37. Mississippi subsequently authorized nitrogen hypoxia by statute in 2017, followed by Alabama in 2018, Louisiana in 2024, and Arkansas in 2025.

### B. Louisiana Authorized Nitrogen Hypoxia in 2024

38. For more than three decades, beginning in 1991, lethal injection was the only authorized method of execution in Louisiana.

39. On March 5, 2024, Governor Landry signed Act 5 of the Second Extraordinary Session of 2024. Act 5 amended La. Rev. Stat. §§ 15:569 and 15:570, expanding statutory confidentiality protections for persons and entities involved in the execution process and authorizing nitrogen hypoxia and electrocution as additional methods of execution. The amendments became effective July 1, 2024.[4]

[4] Although Louisiana law authorizes electrocution, Plaintiff does not challenge that method here because DPSC presently lacks both the equipment and procedures necessary to carry it out. In sworn deposition testimony given on July 20, 2026, Secretary Westcott confirmed that Louisiana does not currently have an electric chair and that DPSC has no electrocution protocol. He further testified that DPSC is not undertaking any efforts to construct an electric chair "or any similar device," that any such effort could not begin without his approval, and that he would not initiate the development of an electrocution protocol. And even if those practical barriers were removed, Westcott testified that he "would never choose electrocution as long as [he is] secretary."

40. Under Act 5, the DPSC Secretary has unfettered discretion to choose among lethal injection, nitrogen hypoxia, and electrocution, "with no preference to the method of execution," at any time up to seven days after receiving an execution warrant.

41. Specifically, La. Rev. Stat. § 15:569(A)–(B) provides:

> **A.** Every sentence of death imposed in this state shall be executed at the Louisiana State Penitentiary at Angola. Every execution shall be made in a room entirely cut off from view of all except those permitted by law to be in the room. At the discretion of the secretary of the Department of Public Safety and Corrections and with no preference to the method of execution, every sentence of death shall be by one of the following methods:
>
> (1) Intravenous injection of a substance or substances in a lethal quantity into the body.
>
> (2) Nitrogen hypoxia.
>
> (3) Electrocution, causing to pass through the body of the person convicted a current of electricity of sufficient intensity to cause death, and the application and continuance of such current through the body of the person convicted until such person is dead.
>
> **B.** Upon receipt of the warrant commanding the secretary to cause the execution of the person condemned as provided by law, the secretary shall, within seven days, provide written notice to the condemned person of the manner of execution.[5]

42. Section 15:569 provides no substantive criteria governing the Secretary's selection among those methods and requires no explanation for selecting one method rather than another for a particular condemned prisoner.

43. The statute also provides that no licensed healthcare professional may be compelled to participate in an execution and exempts the "procedures and policies concerning the process for implementing a sentence of death" from the Louisiana Administrative Procedure Act.[6]

---

[5] La. Rev. Stat. § 15:569(A)–(B).
[6] La. Rev. Stat. § 15:569(A), (C)–(D).

44. Act 5 also significantly expanded existing execution-confidentiality protections, extending them expressly to people, businesses, and entities that supply drugs, medical equipment, and other materials used in executions. La. Rev. Stat. § 15:570(G) provides, in full:

> **G.** It is the intent of the legislature that the provisions of this Subsection shall be construed to ensure the absolute confidentiality of the identifying information of any person, business, organization, or other entity directly or indirectly involved in the execution of a death sentence within this state. This confidentiality provision shall prevail over any conflicting provision in state law related to public disclosure.
>
> **(1)** Except as provided in Subsection F of this Section, the identity of any person who participates in or performs ancillary functions in the execution process, including a person or business that delivers, dispenses, distributes, supplies, manufactures, or compounds the drugs, equivalent drug products, pharmacy-generated drugs, device drugs, medical supplies, medical equipment, or other supplies or materials intended for use by the Department of Public Safety and Corrections in the administration of an execution shall be confidential and shall not be disclosed.
>
> **(2)** Except as provided in Subsection F of this Section, information or records that identify or could reasonably lead to the identification of any person who participates in or performs ancillary functions in the execution process shall not be admissible as evidence nor discoverable in any proceeding before any court, tribunal, board, agency, legislative committee, or person. This shall include the information or records of any person or business that delivers, dispenses, distributes, supplies, manufactures, or compounds the drugs, equivalent drug products, pharmacy-generated drugs, device drugs, medical supplies, medical equipment, or other supplies or materials intended for use by the Department of Public Safety and Corrections in the administration of an execution.[7]

**C. DPSC Modeled Louisiana's Nitrogen-Hypoxia Procedure on Alabama's**

45. After Act 5 was enacted, DPSC officials traveled to Atmore, Alabama, in March 2024 to examine Alabama's execution chamber and nitrogen-delivery system. Alabama had then conducted only one execution by nitrogen hypoxia. DPSC sought "to replicate as closely as

[7] La. Rev. Stat. § 15:570(G)(1)–(2).

possible" Alabama's system because Alabama was the only state that had carried out such an execution.

46. DPSC's initial effort did not reproduce Alabama's system. As such, a second group of DPSC employees traveled to Alabama in July 2024. DPSC ordered replacement equipment after that visit and completed a Louisiana system that "mirrors Alabama."

47. DPSC obtained nitrogen in July 2024, began training its execution team in August 2024, and completed work on the nitrogen-hypoxia system in September 2024. DPSC did not officially adopt a written nitrogen-hypoxia protocol until February 7, 2025. A redacted version of this first written protocol was not made publicly available until March 6, 2025, just 12 days before Louisiana executed Jessie Hoffman, Jr. by nitrogen hypoxia. Before then, execution personnel trained by combining Louisiana's already-existing execution procedures with Alabama's protocol and the information DPSC officials obtained in Alabama.

48. In generating its official written protocol, DPSC reviewed only Alabama's nitrogen-hypoxia protocol. Alabama's protocol was itself developed without the involvement of any doctors or scientists, without consultation with independent or third-party experts, and without medical or scientific oversight of the testing used in its development. Indeed, then-Commissioner John Hamm admitted that, prior to final approval, he took no steps to confirm that the protocol would not cause pain and suffering, terror, or psychological trauma.

49. DPSC did nothing to correct these deficiencies. No doctor or other medical professional was consulted in creating Louisiana's protocol. Nor did DPSC consider medical textbooks or medical journals. And Secretary Westcott, who reviewed and signed the final protocol, admitted that he did nothing to determine whether the Protocol sufficiently protects the

constitutional rights of condemned prisoners. The resulting protocol was "almost exactly" Alabama's.

50. Louisiana's decision to model its nitrogen-hypoxia system and protocol on Alabama's is consequential. As detailed below, the risks inherent in execution by nitrogen hypoxia have now been demonstrated in executions carried out under Alabama's substantially similar procedure—and in Louisiana's own execution of Jessie Hoffman.

**D. Nitrogen Hypoxia Presents a Substantial Risk of Serious Harm**

51. "Nitrogen hypoxia" is a method of execution that forces the condemned prisoner to inhale nitrogen gas, displacing the oxygen available to the prisoner and causing death by oxygen deprivation. From a medical perspective, "nitrogen asphyxiation" is the more accurate description because the method kills by suffocation or smothering through deprivation of oxygen.

52. During an execution by nitrogen hypoxia, nitrogen gas replaces the breathable air available to the prisoner until the prisoner is breathing almost pure nitrogen. As the prisoner continues breathing, oxygen levels in the blood and tissues fall until oxygen deprivation causes death.

53. This process is not instantaneous. When nitrogen begins to flow, it must first displace the oxygen-containing air already present in the mask, tubing, and prisoner's lungs. And even after the lungs become fully deprived of oxygen, oxygen already circulating in the prisoner's blood continues to reach the brain. As a result, blood-oxygen levels fall progressively rather than all at once, and the prisoner remains conscious while experiencing increasingly severe deprivation before eventually losing consciousness.

54. As the prisoner's oxygen level falls, the body generates an increasingly powerful drive to breathe. Once oxygen falls below a critical level, that drive takes off, making the prisoner desperate to try to correct the worsening deprivation. In response to this severe hypoxia (i.e., lack of oxygen), the body attempts to increase ventilation by breathing faster and taking larger breaths.

55. Despite this incredibly strong stimulus to breathe, continued attempts to inhale supply more nitrogen rather than oxygen. These attempts to inhale therefore provide no relief, and the prisoner's inability to respond to basic survival instincts creates a vicious cycle of suffering via conscious suffocation.

56. The suffocating sensation caused by this escalating and unrelenting perception that air is urgently needed but is unavailable is known as "air hunger." Air hunger is the most severe and disturbing form of dyspnea, the medical term for discomfort associated with breathing. It is a physical, bodily sensation produced when the body's increasingly powerful physiological drive to breathe cannot be satisfied.

57. Air hunger engages the body's most basic survival drive—the immediate need to obtain oxygen or face death—and therefore evokes intense physiological stress, physical discomfort, severe emotional distress, and anxiety.

58. Air hunger can be far worse than pain. Unlike pain, which is often localized to a particular part of the body, air hunger is a holistic discomfort sensation from which a person cannot readily distract themselves.

59. Peer-reviewed medical literature describes air hunger as among the most distressing forms of human suffering, in large part because it produces an intense, smothering sensation akin to suffocation or drowning. This characterization is borne out by reports from

survivors of nonfatal drowning and patients with heart failure and pulmonary disease, who attest to the profound agony of severe dyspnea associated with these experiences and conditions. Consistent with these reports, patients surveyed in clinical settings have described air hunger as being like suffocation or drowning, having an elephant on your chest, or being crushed by a boa constrictor. Patients also consistently describe terror, panic, and anxiety stemming from being unable to get enough air, losing control over their breathing, and believing that death is imminent.

60. Relatedly, researchers have conducted controlled laboratory desaturation studies using healthy volunteers. In these studies, at blood oxygen saturation levels of 60% to 100%, the volunteers reported "symptoms rang[ing] from minimal or mild shortness of breath and visual changes to a full-blown feeling of suffocation." At blood oxygen saturations of less than 60%, the "majority of people, not yet unconscious, report[ed] significant distress and shortness of breath."

61. "[B]elow 50% [blood oxygen saturation levels], the cruel nature of administering nitrogen to humans becomes universally apparent. . . . With sudden loss of an oxygen supply, humans feel significant and distressing shortness of breath. This is usually accompanied by anxiety, increased heart rate, sweating, sleepiness, visual loss, and a feeling of impending doom." Because of these findings, "it is [now] unethical to even study the effects of very low oxygen levels (<60%) on humans." Put differently, scientists "have stopped using desaturations below 60% due to concerns for study participant safety and comfort."

62. Carbon-dioxide accumulation is not necessary to cause air hunger. Controlled research has established that hypoxia alone can generate air hunger comparable to that caused by elevated carbon dioxide.

63. The panic and terror caused by air hunger are different from the general anticipatory anxiety that may accompany a condemned inmate's knowledge of an impending execution. Air hunger is itself a profoundly distressing physiological and physical experience that arises from the immediate inability to satisfy the body's demand for oxygen, and the panic and terror it causes are consequences of that experience. Pharmacological evidence confirms this distinction: extensive scientific study has demonstrated that medications such as benzodiazepines may reduce generalized anticipatory anxiety but cannot treat the underlying sensation of air hunger and the myriad forms of suffering that result.

64. Execution by nitrogen hypoxia also causes flash pulmonary edema. Flash pulmonary edema results from a sudden, severe rise in blood pressure caused by an extreme level of physiologic stress, which forces fluid into the lungs. Importantly, this occurs early in the execution while the condemned prisoner remains conscious; after consciousness is lost, by contrast, heart rate and blood pressure are low. As fluid accumulates, the normally compliant lungs become heavy and stiff, increasing the work of breathing and making it even harder for the prisoner to breathe. Flash pulmonary edema is therefore both a physical manifestation of the extreme physiologic stress caused by conscious suffocation and a source of further suffering because it exacerbates air hunger.

65. The suffering caused by nitrogen hypoxia is therefore not limited to the psychological distress associated with the abstract knowledge of impending death. Severe air hunger inflicts profound physiological distress and physical discomfort as the body's increasingly desperate but unsatisfied drive to breathe produces the excruciating sensation of conscious suffocation or drowning. Throughout this period, as air hunger persists and intensifies, it also produces anxiety, terror, panic, and psychological distress.

66. Certain features of the nitrogen asphyxiation execution process can intensify already intolerable suffering. Restraints that limit movement of the chest or abdomen can further worsen conscious suffocation by restricting expansion of the chest wall, movement of the diaphragm, or the size of each breath, thus preventing the prisoner from responding fully to the body's escalating demand for increased ventilation.

67. The introduction of oxygen during an execution by nitrogen hypoxia—for example, with an improperly sealed mask—can prolong these symptoms. It can extend the time for the condemned prisoner to reach unconsciousness, prolong the painful sensation of conscious suffocation (i.e., air hunger), intensify the impact of the psychological pain, and increase the likelihood that the prisoner enters a persistent vegetative state or experiences a stroke.

68. The deprivation of oxygen can also cause nausea and vomiting. This is particularly relevant in the execution setting, because the condemned prisoner is strapped to a gurney in the supine position. Vomiting can thus cause the condemned to choke to death.

69. For many of these same reasons, the American Veterinary Medical Association has advised that nitrogen gas is "unacceptable" as a euthanasia method for most mammals, because it "create[s] an anoxic environment that is distressing for some species and aversive to [others]."

70. Further, studies of torture survivors have identified conscious asphyxiation as among the most distressing and uncontrollable methods of torture. Because forced inhalation of nitrogen gas causes the condemned prisoner to feel that same excruciating and painful sensation of suffocation, the U.N. Human Rights Office has expressed serious concerns that the "grave suffering" that nitrogen hypoxia likely causes "amount[s] to torture under international law."

71. This institutional disavowal is not limited to the contemporary period. The closest historical analogue to nitrogen hypoxia is *peine forte et dure*: a punishment that caused death through conscious asphyxiation. At the time of the American founding, it had already been squarely rejected: the "practice was condemned by Blackstone as a 'cruel process,' abolished by Parliament in 1772, and inconsistent with the American colonial tradition forbidding punishments that were 'inhumane, barbarous, or cruel.'"

**E. The First Eight Nitrogen Hypoxia Executions Demonstrate the Severe and Prolonged Suffering the Method Inflicts on Condemned Prisoners.**

72. The first eight executions by nitrogen hypoxia in the United States—seven in Alabama and one in Louisiana—have confirmed the above-mentioned risks and eliminated any serious doubt about what this method entails. Their record exposes nitrogen hypoxia as exactly what the Eighth Amendment forbids: the unnecessary and wanton infliction of terror, pain, and suffering.

73. In January 2024, the Alabama Department of Corrections ("ADOC") executed Kenneth Smith—the first person ever executed by nitrogen hypoxia. This involved strapping Mr. Smith to a gurney, fitting him with a respirator mask connected to nitrogen gas, and then administering the nitrogen gas.

74. Before the execution, the Alabama Attorney General represented that, "[i]n all likelihood, hypoxia will cause unconsciousness in a matter of seconds, rendering Smith unable to feel pain." The Attorney General further posited: "ADOC's nitrogen hypoxia protocol will rapidly reduce oxygen inside the mask, cause unconsciousness within seconds, and cause death within minutes."

75. But eyewitnesses to the execution reported that, when ADOC started the flow of nitrogen gas, Mr. Smith started "to convulse and shake vigorously for about four minutes. . . . It

was another two to three minutes before he appeared to lose consciousness, all while gasping for air to the extent the gurney shook several times." Mr. Smith was declared dead twenty-seven minutes after ADOC initiated the flow of gas.

76. Prior to Mr. Smith's execution, prison personnel also told the victim's son Mike Sennett that Mr. Smith would "take two or three breaths and he'd be out and gone." However, according to Mr. Sennett: "That ain't what happened. After about two or three breaths, that's when the struggling started. Other people kept saying he was trying to raise himself up. . . . With all that struggling and jerking and trying to get off that table, more or less, it's just something I don't ever want to see again."

77. Media witness Lee Hedgepeth further recounted that Mr. Smith's head moved back and forth violently in the minutes after the execution began. Though having witnessed four lethal injection executions, Mr. Hedgepeth stated that he had "never seen such a violent reaction to an execution."

78. Autopsy results confirm that Mr. Smith suffered during the execution: his autopsy report showed evidence of flash pulmonary edema. As detailed above, flash pulmonary edema occurs when a person is conscious, signals physiological harm, and exacerbates the already excruciating suffering caused by prolonged air hunger.

79. On September 26, 2024, ADOC executed Alan Eugene Miller by nitrogen gas. Mr. Miller reportedly "shook and trembled on a gurney for about two minutes, with his body at times pulling against restraints. . . . The shaking and trembling was followed by about six minutes of periodic gulping breaths before he became still . . . ." One of the witnesses to Mr. Miller's execution stated that Mr. Miller's "face was twisted and he looked like he was

suffering." Autopsy results confirm that Mr. Miller suffered during the execution: as with Mr. Smith, his autopsy report showed evidence of flash pulmonary edema.

80. On November 21, 2024, ADOC executed Carey Dale Grayson by nitrogen gas. Dr. Brian McAlary, a board-certified anesthesiologist who witnessed the execution, observed that for several minutes after the nitrogen began to flow, Mr. Grayson increased the depth and rate of his breathing, clenched his hands, raised his head, struggled against his restraints, and displayed signs of fear and distress. Mr. Grayson also lifted both legs approximately 45 degrees off the gurney and held them in the air for about 30 seconds before lowering them back down—a controlled movement that, in Dr. McAlary's medical judgment, would almost certainly require a conscious effort. Dr. McAlary concluded that Mr. Grayson's movements and respiratory patterns were purposeful in nature and consistent with residual consciousness. Again, autopsy results confirm that Mr. Grayson suffered during the execution: his autopsy report showed evidence of flash pulmonary edema.

81. On February 6, 2025, ADOC used nitrogen gas to execute Demetrius Terrence Frazier. Media reported that, once the nitrogen gas flowed, Mr. Frazier "appeared to struggle to breathe and seemed to clench the muscles in his face. . . . Frazier's legs appeared to tense and raise a few inches off of the gurney, with his head seemingly lolling to the side. His arms seemed to tighten and fists clenched." These visible struggles lasted approximately ten minutes after the gas began to flow.

82. On June 10, 2025, ADOC executed Gregory Hunt by nitrogen gas. According to media reports, approximately one minute into the execution, Mr. Hunt "began gasping and lifted his head. His entire body began convulsing." Two minutes later, Mr. Hunt's head "fell back, and he groaned loudly." He continued to move his head and gasp "intermittently . . . for the next

several minutes," taking his final breath approximately eight minutes after ADOC is believed to have started the nitrogen gas.

83. On September 25, 2025, ADOC executed Geoffrey Todd West by nitrogen gas. Media witnesses reported that, after the execution began at 5:56 p.m., "West's eyes were open as he appeared to gulp and struggle for breath during the first two minutes. His head rocked from side to side, his left fist curled up and he appeared to slightly foam at the mouth." Mr. West was pronounced dead 26 minutes after the execution began.

84. On October 23, 2025, ADOC used nitrogen gas to execute Anthony Boyd. Eyewitnesses "described seeing Mr. Boyd convulse and heave for about 15 minutes before being pronounced dead about 15 minutes later." Per ADOC Commissioner Hamm, Mr. Boyd's execution was the longest by nitrogen. In the 37 minutes between correctional officers opening and closing the curtains to the death chamber, Mr. Boyd "gasp[ed] for air inside the gas mask more than 225 times." One witness described the execution as "the worst one yet," further opining that Mr. Boyd maintained "some level of consciousness . . . for at least 16 minutes." The extreme terror and suffering Mr. Boyd experienced were confirmed in his autopsy report, which showed evidence of flash pulmonary edema.

85. The consistently demonstrated problems with execution by nitrogen hypoxia—and the conscious suffocation that it inflicts—are not limited to Alabama. On March 18, 2025, Louisiana executed Jessie Hoffman, Jr. by nitrogen hypoxia. The observations were no different than in Alabama. After the nitrogen began to flow, Mr. Hoffman twitched, breathed heavily, clenched his hands, convulsed, and continued moving for several minutes before becoming still—all signs consistent with respiratory distress. Louisiana continued administering nitrogen for approximately 19 minutes before Mr. Hoffman was pronounced dead. When the curtain later

reopened and his mask was removed, Mr. Hoffman's appearance was consistent with someone who died while experiencing extreme suffering: his head was tilted back, with his teeth exposed in a grimace. As with Smith, Miller, Grayson, and Boyd, Mr. Hoffman's autopsy showed evidence of flash pulmonary edema. Despite the foregoing, to date DPSC has conducted no formal review of Mr. Hoffman's execution; its only assessment was an informal conversation among Secretary Westcott, Chief Smith, and Warden Vannoy.

86. Most recently, Alabama planned to execute Jeffery Lee on June 11, 2026. However, on June 8, 2026, the Eleventh Circuit Court of Appeals held that Alabama's protocol—which, as alleged above, has been substantially copied by Louisiana—presented "a substantial risk of serious harm" that "is not conjectural, speculative, or doubtful."[8] The Court specifically cited the district court's factual findings regarding the likelihood of prolonged air hunger and flash pulmonary edema in arriving at this conclusion. It also expressly distinguished the Fifth Circuit's earlier decision in Hoffman v. Westcott, explaining that, unlike the preliminary injunction record in Hoffman, the trial record in Lee established that nitrogen hypoxia causes "profound physiological discomfort and distress"—in addition to mental distress—through severe air hunger. Subsequently, on June 9, Alabama was permanently enjoined from executing Mr. Lee pursuant to its nitrogen hypoxia protocol.[9]

[8] Lee v. Comm'r, Ala. Dep't of Corr., No. 26-11864, 2026 WL 1651147, at *8 (11th Cir. June 8, 2026) (per curiam).
[9] Lee v. Lovelace, No. 2:25-cv-680-ECM, 2026 WL 1664095, at *11 (M.D. Ala. June 9, 2026).

### F. Louisiana's Nitrogen-Delivery System Compounds the Risk of Prolonged Conscious Suffocation.

87. Louisiana's nitrogen-delivery apparatus itself contains features that increase the (already intolerable) risk that a condemned prisoner will experience a prolonged period of conscious suffocation.

88. These defects were foreseeable given DPSC's ad hoc design and construction process. DPSC constructed the nitrogen-delivery system without any engineering drawings or schematics. DPSC officials also failed to consult applicable Louisiana building or plumbing codes in designing and installing the system. And after construction was complete, the system was not subjected to any third-party certification.

89. The resulting gas-delivery system is assembled using fittings and couplings that are not standard medical-grade fittings and would not satisfy hospital or clinical standards for equipment used to deliver gas to a person's airway. And its electrical components are connected using extension cords rather than a dedicated electrical installation, creating a risk that an electrical failure or malfunction could interrupt or compromise gas delivery during the execution.

90. More significantly, Louisiana's system uses two separate manual valves to control the delivery of breathing air and nitrogen. DPSC's intended procedure calls for the operator to turn on the nitrogen before turning off the breathing air, resulting in a period when both gases flow simultaneously. When these gases mix, the breathing air will dilute the concentration of nitrogen reaching the mask and further prolong the period of conscious suffocation that the prisoner experiences. Yet the system has no means of determining whether such dilution has occurred: it contains no sensor, meter, or detector capable of measuring the concentration of nitrogen and oxygen in the gas delivered to the prisoner.

91. The risk is compounded by approximately fifteen feet of tubing downstream from the valves, with an internal volume of at least one liter. When the system is switched from breathing air to nitrogen, the gas already contained in that tubing must first be displaced. The prisoner may therefore experience a prolonged period of worsening oxygen deprivation while still conscious, extending the severe air hunger and conscious suffocation that precede loss of consciousness.

92. Louisiana's system also uses a flow meter calibrated for oxygen to measure and control the flow of nitrogen. Because a flow meter calibrated for one gas does not necessarily accurately measure the flow of another, the actual rate at which nitrogen reaches the prisoner may differ from the rate intended or displayed.

93. Finally, the execution gurney is fixed at an angle, with restraints crossing the prisoner's chest and torso. Those restraints must be sufficiently tight to prevent the prisoner from sliding out of position. In doing so, however, they can restrict the prisoner's ability to increase the volume of each breath as oxygen deprivation intensifies, compounding the sensation of conscious suffocation and the suffering, terror, and pain that results.

### G. Louisiana's Protocol Omits Safeguards Necessary to Prevent Conscious Suffocation.

94. The above demonstrated risks are further compounded by Louisiana's failure to adopt safeguards adequate to prevent, mitigate, or respond to prolonged conscious suffocation during an execution by nitrogen hypoxia. In fact, via sworn testimony given on August 12, 2026, Warden Vannoy stated that even if he observed a prisoner experiencing what he believed was pain during an execution by nitrogen hypoxia, he would not stop the execution.

95. DPSC's current execution regulation is Department Regulation No. OP-D-8, dated July 13, 2026 (the "Protocol"). The Protocol provides that, approximately one hour before

the execution, personnel connect a cardiac monitor and pulse oximeter, pressurize the nitrogen-hypoxia system, and connect a "continuous-flow, full face, supplied air respirator with head straps" to the breathing-gas tubing.

96. After the prisoner is secured to the gurney, the Protocol directs personnel to open a supply of breathing air to the mask and, before placing the mask on the prisoner, insert a portable oxygen meter into the inflow for at least fifteen seconds to confirm that breathing air is being supplied. After the mask is "placed and fitted," the pulse oximeter is monitored continuously for two minutes. The prisoner may then make a last verbal statement of up to two minutes.

97. The Protocol provides that "[s]uction will be used if emesis [vomiting] is present prior to the administration of the nitrogen hypoxia." The Warden or designee then "verif[ies] mask placement." Nitrogen is thereafter administered at a flow rate of 70 liters per minute for fifteen minutes or five minutes following a flatline indication on the EKG, whichever is longer.

98. As relevant here, the Protocol omits the safeguards necessary to prevent conscious suffocation during an execution and accordingly violates the constitutional bar on cruel and unusual forms of punishment:

a. The Protocol does not require the use of an individualized mask designed to securely affix to the specific prisoner's face. An individualized mask helps keep oxygen out of the nitrogen-delivery system. If oxygen leaks inside the mask, it will extend the time for the condemned prisoner to reach unconsciousness, prolong the feeling of suffocation, and increase the risk of a stroke or falling into a vegetative state.

b. The Protocol provides for a "mask test" before the execution and requires personnel to place and adjust the mask on the prisoner but does not require a quantitative fit test while

the prisoner is wearing the mask, establish a permissible leakage rate, or require an objective measurement confirming that the mask has formed and maintained a seal sufficient to exclude room air.

c. Although the Warden or designee "verif[ies] mask placement" after the prisoner makes a last statement, the Protocol does not require a renewed fit test or other objective determination that movement of the prisoner's face and jaw has not dislodged the mask or compromised its seal.

d. The Protocol does not account for residual oxygen in the tubing, mask, and other parts of the nitrogen-hypoxia execution system. Residual oxygen in the system carries the same risks as an improperly sealed mask: it can extend the time to unconsciousness and prolong the excruciating sensation of air hunger.

e. The Protocol recognizes the possibility of vomiting and provides for suction if emesis is present before nitrogen administration but provides no mechanism to address fluids or vomit expressed into the mask after nitrogen begins. Vomiting into a full-face mask while the condemned prisoner is restrained in the supine position could cause the prisoner to choke.

f. The Protocol does not specify the purity of the nitrogen gas that must be used in an execution or require independent testing to confirm its composition before use. Less than pure nitrogen can prolong the time for the prisoner to reach unconsciousness.

g. The Protocol provides no limit on the time a prisoner being executed may suffer. Nitrogen must be administered for fifteen minutes or five minutes following a flatline indication on the EKG, "whichever is longer." The Protocol therefore establishes a minimum period of nitrogen administration but no maximum. No duration of continued

consciousness, gasping, convulsions, retching, struggling, or other visible suffering requires personnel to pause the execution or determine whether the mask or gas-delivery system is functioning as intended.

h. The Protocol does not provide for medical monitoring or intervention during nitrogen administration. Although Louisiana law directs that an execution take place in the presence of a physician summoned by the Warden, no healthcare professional may be compelled to participate in or even attend an execution.[10] And even if a physician attends, the Protocol designates the physician only as a "required witness" and assigns the physician no role in monitoring the prisoner or responding to complications during nitrogen administration.

i. The Protocol does not require continued pulse-oximetry monitoring after nitrogen begins or prescribe checks to determine whether the prisoner remains conscious. Nor does it require personnel to evaluate responsiveness, purposeful movement, respiratory distress, or other indications that the prisoner remains conscious and suffering.

j. The Protocol does not prescribe a procedure to be followed after nitrogen begins if the mask shifts, its seal fails, room air enters the mask, gas delivery is interrupted, or the prisoner remains visibly conscious.

k. The Protocol provides for health and mental-health observation in the period preceding an execution but does not prescribe any alteration to the nitrogen-hypoxia procedure based on what those evaluations disclose. It contains no individualized safeguards based on medical or psychological conditions that may affect the prisoner's response to restraint, masking, or oxygen deprivation.

[10] La. Rev. Stat. §§ 15:569(C), 15:570(A)(3), (C).

l. The Protocol requires personnel to secure the prisoner to the gurney and "check all straps," but does not prescribe how the restraints must be positioned or tightened to avoid restricting chest-wall and lung expansion. A restraint that impairs chest-wall and lung expansion can prevent the prisoner's lungs from expanding as the physiological drive to breathe intensifies, further compounding dyspnea and air hunger.

99. The risks created by nitrogen hypoxia and Louisiana's Protocol are not necessary to carry out a sentence of death. Louisiana already provides for a feasible and readily implemented alternative that would significantly reduce those risks: execution by single-drug pentobarbital.

### H. Louisiana's Midazolam-and-Hydromorphone Method of Execution Also Presents a Substantial Risk of Severe Pain.

100. DPSC's current Protocol also authorizes execution using a two-drug combination of midazolam and hydromorphone. The Protocol calls for the rapid intravenous administration of 10 milligrams of midazolam and 40 milligrams of hydromorphone, followed by a 25-milliliter saline flush. If death does not occur within five minutes of completion of that flush, the Protocol calls for a second injection of 10 milligrams of midazolam and 40 milligrams of hydromorphone, followed by another saline flush. If death still does not occur within five minutes of completion of the second flush, DPSC administers an additional 60 milligrams of hydromorphone. Louisiana originally adopted this procedure in January 2014 by copying Ohio's then-new lethal-injection protocol, which Ohio had recently used to execute Dennis McGuire.

101. Midazolam is a benzodiazepine sedative, not a barbiturate, and has no analgesic properties. Critically, it cannot reliably produce the "deep, comalike unconsciousness" necessary to protect a prisoner from severe pain. Midazolam's effect on the central nervous system is limited by a ceiling effect—a point beyond which increasing the dose does not produce a

correspondingly greater pharmacological effect. Thus, even at high doses, midazolam cannot be relied upon to render a prisoner unconscious and insensate to pain.

102. Hydromorphone does not solve that problem. Hydromorphone is a potent opioid analgesic, but it is not a general anesthetic and does not reliably produce unconsciousness, even at high doses. At the same time, opioids can severely impair breathing and reduce muscle tone in the upper airway, causing the tissues of the airway to collapse and partially or completely obstruct airflow. At high doses, opioids can also cause severe chest-wall rigidity that can make it even more physically difficult to breathe. These effects can occur while awareness persists. And hydromorphone does not reliably relieve the resulting breathlessness or sensation of suffocation.

103. Louisiana's Protocol therefore pairs a drug that cannot reliably produce deep anesthesia with an opioid that is likely to progressively impair the prisoner's ability to breathe without reliably extinguishing awareness, creating a substantial risk that he will remain conscious while experiencing severe air hunger and the pain, suffering, and terror attendant to that experience.

104. Louisiana chose to replicate this two-drug protocol despite knowledge that its first-ever use had recently subjected a condemned prisoner to a prolonged and agonizing death. In January 2014, Ohio used midazolam and hydromorphone to execute Dennis McGuire. After the drugs were administered, Mr. McGuire struggled against his restraints and gasped loudly for air. For approximately 10 to 15 minutes, his struggle was accompanied by snorting and choking sounds, with one witness describing him as clenching his fists throughout. Toward the end, a witness described Mr. McGuire's gasping as resembling a fish lying along the shore, desperately trying to breathe. His execution lasted approximately 26 minutes.

105. Six months later, Arizona used midazolam and hydromorphone to execute Joseph Wood, with even more troubling results. Although Arizona's protocol called for a single injection containing 50 milligrams of each drug, officials repeatedly administered additional doses as Mr. Wood failed to die. Over the course of nearly two hours, Mr. Wood received fifteen injections—a cumulative 750 milligrams of midazolam and hydromorphone. For more than an hour and a half, witnesses watched Mr. Wood repeatedly gasp and gulp for air, describing him as "gulp[ing] like a fish on land" more than 640 times before he was finally pronounced dead.

106. No state has carried out an execution using midazolam and hydromorphone since Mr. Wood's execution in July 2014. More than twelve years later, Louisiana nevertheless continues to authorize the same drug combination.

**I. Single-Drug Pentobarbital Is a Feasible and Readily Implemented Alternative.**

107. The use of a single dose of pentobarbital compounded by a duly licensed compounding pharmacy, tested for integrity, purity, and potency by a laboratory unaffiliated with a compounding pharmacy or a department of corrections, and used in a single-drug protocol is a feasible and readily implemented alternative to execution by nitrogen hypoxia that would significantly reduce the substantial risk of severe pain presented by Louisiana's nitrogen-hypoxia procedure.

108. Louisiana already provides for execution using single-drug pentobarbital. DPSC's current Protocol provides that, if pentobarbital is used, five grams will be prepared and intravenously administered as the primary dose. An additional ten grams must be obtained and kept available for administration if the initial dose proves insufficient.

109. The Protocol expressly contemplates obtaining pentobarbital "from a manufacturer, distributor or compounding pharmacy." It sets forth procedures for preparation of

the drug, establishment of intravenous access, administration of the pentobarbital and saline flush, cardiac monitoring, and administration of additional doses if necessary.

110. Thus, DPSC has already adopted the procedures necessary to carry out an execution using single-drug pentobarbital.

111. Nor is the use of single-drug pentobarbital novel. Since January 1, 2015, more than half of all executions in the United States have been carried out using single-drug pentobarbital. And the method remains in active use: Arizona, Georgia, Indiana, Missouri, South Carolina, Tennessee, Texas, and Utah have carried out executions using single-drug pentobarbital in recent years.

112. States have also continued to obtain new supplies of pentobarbital for use in executions. Idaho possessed certified manufactured pentobarbital in 2023 and purchased an additional supply of manufactured pentobarbital in October 2024.

113. More recent public records confirm that this procurement has continued. Indiana purchased six additional vials of pentobarbital on April 30, 2025. Before the October 2025 execution of Roy Ward, Indiana purchased an additional dose so that three doses would be available for the execution. Indiana represented in related court proceedings that the pentobarbital it intended to use was manufactured rather than compounded.

114. Texas has also continued to replenish its supply. Public records disclosed in 2025 show that Texas obtained twenty 1-gram vials of pentobarbital in September 2024 and an additional eight 2.5-gram vials in February 2025. Records further reflect expenditures to acquire pentobarbital beginning in October 2024.

115. Arizona, too, has continued to obtain and prepare pentobarbital for executions. In December 2025, the State represented to the Arizona Supreme Court that ADCRR would use

compounded pentobarbital in the execution of Leroy McGill and sought a scheduling order that would permit the Department to satisfy its testing and disclosure obligations for that drug. In March 2026, ADCRR confirmed that quantitative and sterility testing of its compounded pentobarbital had been completed and that testing confirmed a sufficient concentration of pentobarbital in the solution. Arizona thereafter executed McGill—without complication or visible signs of unnecessary suffering—using a single dose of pentobarbital on May 20, 2026.

116. Finally, the Federal Government has demonstrated its ability to obtain pentobarbital. In 2019, the Federal Bureau of Prisons (BOP) secured pentobarbital active pharmaceutical ingredient (API) from a domestic bulk manufacturer and secured the services of a federally registered compounding pharmacy to convert that ingredient into injectable pentobarbital. The resulting injectable drug was subjected to quality testing by the pharmacy and independent laboratories. BOP thereafter carried out thirteen executions using its single-drug pentobarbital protocol.

117. The Federal Government has since committed to assisting States in obtaining the drugs necessary to conduct lethal-injection executions. On January 20, 2025, President Trump directed the Attorney General to "take all necessary and lawful action to ensure that each state that allows capital punishment has a sufficient supply of drugs needed to carry out lethal injection." On February 5, 2025, Attorney General Pam Bondi directed BOP to "work with each state that allows capital punishment to ensure the states have sufficient supplies and resources to impose the death penalty."[11]

118. Beyond procurement, the Federal Government has recently and directly reaffirmed its preference for single-drug pentobarbital. In April 2026, Acting Attorney General

[11] Exec. Order No. 14,164 § 4(a); Attorney General Memorandum, Reviving the Federal Death Penalty and Lifting the Moratorium on Federal Executions § V (Feb. 5, 2025).

Todd Blanche described pentobarbital as "the gold standard of lethal injection drugs." The DOJ's Office of Legal Policy concluded that single-drug pentobarbital "readily comports with all legal requirements" and recommended that BOP readopt the single-drug pentobarbital protocol used during the first Trump Administration.[12]

119. The same report recommended additional measures to preserve and/or secure the supply of pentobarbital for executions. First, it recommended the same step Louisiana had already taken in 2024: increasing confidentiality protections for companies and individuals involved in providing drugs and equipment used to facilitate capital punishment. Second, the report recommended considering legislation authorizing federal agencies to produce pentobarbital for use in federal and state executions.[13]

### J. Single-Drug Pentobarbital Would Significantly Reduce the Substantial Risk of Severe Pain Presented by Nitrogen Hypoxia or the Combination of Midazolam and Hydromorphone.

120. The use of single-drug pentobarbital would significantly reduce the substantial risk of severe pain presented by execution through nitrogen hypoxia.

121. Pentobarbital is a barbiturate that, when administered in a massive dose, first produces unconsciousness and then suppresses respiration and causes hemodynamic collapse. The dose required to cause respiratory cessation and cardiovascular collapse is greater than the dose required to render a person unconscious. A condemned prisoner administered a lethal dose of pentobarbital therefore becomes unconscious before the respiratory and cardiovascular effects that cause death.

---

[12] DOJ, Office of Legal Policy, Restoring and Strengthening the Federal Death Penalty at i, 19 (Apr. 24, 2026) ["OLP Report"].
[13] Id. at 47.

122. Nitrogen hypoxia does not work in this manner. As detailed above, nitrogen hypoxia causes unconsciousness by depriving a conscious prisoner of oxygen. Before unconsciousness occurs, the prisoner is exposed to prolonged air hunger (i.e., conscious suffocation), which leads to severe emotional distress, terror, anxiety, physiological stress, and physical discomfort.

123. Single-drug pentobarbital avoids this mechanism of suffering. It renders the prisoner unconscious before the respiratory and cardiovascular depression that causes death, rather than causing unconsciousness through the deprivation of oxygen itself.

124. The single-drug pentobarbital protocol would also significantly reduce the substantial risk of severe pain presented by execution through the injection of midazolam and hydromorphone. Unlike midazolam or hydromorphone, pentobarbital reliably produces a deep, comalike unconsciousness from shortly after injection until the moment of death.

125. The Federal Government has recently reached similar conclusions concerning the risk of pain associated with single-drug pentobarbital. In April 2026, the DOJ concluded that there is "no indication" that pentobarbital "superadds" pain and cited "robust scientific opinion" that administration of pentobarbital will not cause unnecessary pain and suffering. As mentioned above, the DOJ therefore recommended that BOP readopt its single-drug pentobarbital protocol. After reviewing the protocol used during the thirteen federal executions conducted in 2020 and 2021, OLP found "no reason to modify any element" of it.[14]

126. DPSC has no legitimate penological justification for refusing to use the single-drug pentobarbital protocol to execute Mr. Wessinger. As detailed above, DPSC has already adopted procedures governing execution by single-drug pentobarbital, the drug remains

[14] Id. at 27-28.

obtainable for use in executions, and the method would significantly reduce the substantial risk of severe pain and serious harm presented by nitrogen hypoxia.

**K. Todd Wessinger Has Exhausted His Administrative Remedies.**

127. On or about May 20, 2026, Plaintiff Wessinger submitted an Administrative Remedy Procedure (ARP) under DPSC's regulations, objecting to the use of nitrogen hypoxia in his execution. DPSC rejected the ARP in a response received by Plaintiff on or about June 30, 2026. Plaintiff submitted a second-step appeal to DPSC on or about July 2, 2026. To date, DPSC has not responded to Mr. Wessinger's second-step appeal.

## V. CLAIMS FOR RELIEF

**A. Execution by Nitrogen Hypoxia Violates Plaintiff's Right to Be Free from Cruel and Unusual Punishment as Guaranteed by the Eighth and Fourteenth Amendments to the United States Constitution**

128. Plaintiff realleges and incorporates by reference the allegations contained in the preceding paragraphs.

129. The Eighth Amendment to the United States Constitution, applicable to the States through the Fourteenth Amendment, prohibits the infliction of superadded pain in the execution of a death sentence.

130. Because it is nearly impossible to determine with certainty whether a prisoner will suffer serious and needless pain and suffering during an execution, the question of whether a particular execution procedure will inflict such pain and suffering involves an inquiry as to whether the prisoner is subject to a substantial or intolerable risk of serious harm.

131. Under the Eighth Amendment, a prisoner must show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason.

Further, the determination whether the risk of pain associated with the State's method is "substantial" is based on that method's comparison to a known and available alternative.

132. Determining whether the State has cruelly "superadded" pain to the punishment of death cannot be accomplished by examining the State's proposed method in a vacuum, but only by comparing that method with a viable alternative.

133. Such a substantial or intolerable risk of serious harm may occur when a state lacks adequate safeguards in its protocol for the method of execution, when experience with the procedure demonstrates that there are foreseeable problems, or when it is known that the method will very likely result in the prisoner suffering intense pain that an alternative procedure would not cause.

134. Defendants' use of nitrogen hypoxia creates a substantial risk that Plaintiff will suffer unnecessary and excruciating pain. Nitrogen hypoxia kills by depriving a conscious prisoner of oxygen, forcing the prisoner to endure severe air hunger—the primal sensation of suffocation—as the body's increasingly desperate drive to breathe goes unsatisfied. Before unconsciousness, this process causes profound physical discomfort and physiological distress, together with terror, anxiety, loss of control, and the sensation of impending death.

135. Experience with nitrogen hypoxia has demonstrated that these risks are foreseeable and substantial. As detailed above, executions carried out by nitrogen hypoxia have involved gasping, struggling, convulsions, and other manifestations of prolonged respiratory distress and conscious suffocation. And, perhaps most tellingly, all five men who have undergone autopsies after execution by nitrogen hypoxia have exhibited evidence of flash pulmonary edema. This generally uncommon autopsy finding is consistent with the sudden, extreme, and consciously experienced physiologic suffering caused by nitrogen asphyxiation.

136. Further, Louisiana's Protocol fails to adequately safeguard against, mitigate, or respond to the risks of severe pain and agony presented by nitrogen hypoxia.

137. The use of nitrogen hypoxia presents risks of severe pain and serious harm that are substantial in comparison to the one-drug pentobarbital protocol.

138. There is a feasible alternative which could substantially reduce the risk of severe pain and serious harm presented by execution via nitrogen hypoxia.

139. The use of a lethal dose of pentobarbital in a single-drug protocol is a feasible and readily implemented alternative which would significantly reduce the substantial risk of severe pain presented by nitrogen hypoxia. DPSC has already adopted a protocol governing execution by single-drug pentobarbital, and pentobarbital remains obtainable for use in executions.

140. Single-drug pentobarbital would significantly reduce the substantial risk of severe pain presented by nitrogen hypoxia because pentobarbital renders the prisoner unconscious before the respiratory and cardiovascular effects that cause death. Nitrogen hypoxia, by contrast, causes unconsciousness through oxygen deprivation itself, exposing the condemned prisoner to prolonged air hunger before consciousness is lost.

141. Defendants' refusal to adopt this alternative for the execution of Plaintiff, in the face of its documented advantages, without a legitimate penological justification, constitutes cruel and unusual punishment prohibited by the Eighth Amendment.

142. For the reasons set forth above, Defendants are deliberately indifferent to Plaintiff's constitutional rights.

143. This Court has the jurisdiction and authority to enter a declaratory judgment and a preliminary and permanent injunction to prevent the violations of the Eighth and Fourteenth Amendments alleged in this Count.

**B. Execution by Midazolam and Hydromorphone Violates Plaintiff's Right to Be Free from Cruel and Unusual Punishment as Guaranteed by the Eighth and Fourteenth Amendments**

144. Plaintiff realleges and incorporates by reference the preceding paragraphs.

145. Defendants' use of midazolam and hydromorphone to execute Plaintiff would create a substantial risk of unnecessary and severe pain. Midazolam cannot reliably produce the deep, comalike unconsciousness necessary to render a prisoner insensate to pain, while hydromorphone can severely impair breathing, obstruct the upper airway, and cause chest-wall rigidity while awareness persists. Together, these effects create a substantial risk that Plaintiff will remain conscious while experiencing severe air hunger and the pain, suffering, and terror of conscious suffocation.

146. The foreseeable consequences of this drug combination have been demonstrated in practice. The only two executions carried out using midazolam and hydromorphone—those of Dennis McGuire and Joseph Wood—were extraordinarily prolonged and marked by extreme respiratory distress: Mr. McGuire took approximately 26 minutes to die, while Mr. Wood's execution lasted nearly two hours as he repeatedly gasped and gulped for air more than 640 times. No state has carried out another execution using this drug combination since Mr. Wood's execution in July 2014.

147. As alleged above, these risks are substantial in comparison to execution by single-drug pentobarbital.

148. Single-drug pentobarbital is a feasible and readily implemented alternative that would significantly reduce the substantial risk of severe pain presented by execution using midazolam and hydromorphone.

149. Defendants' refusal to use that alternative for Plaintiff's execution, without a legitimate penological justification, would subject Plaintiff to a substantial risk of severe pain and constitute cruel and unusual punishment prohibited by the Eighth Amendment.

150. This Court has the jurisdiction and authority to grant declaratory and injunctive relief preventing the violations alleged in this Count.

## PRAYER FOR RELIEF

**WHEREFORE, Plaintiff respectfully requests that this Court:**

A. Grant a declaratory judgment that executing Plaintiff by nitrogen hypoxia or midazolam and hydromorphone pursuant to DPSC's Execution Protocol would violate the Eighth and Fourteenth Amendments to the United States Constitution;

B. Grant a temporary restraining order, a preliminary injunction, and/or a permanent injunction enjoining Defendants, their officers, agents, employees, and all persons acting in concert or participation with them from executing Plaintiff by nitrogen hypoxia or midazolam and hydromorphone;

C. Award Plaintiff his reasonable attorneys' fees, costs, and expenses pursuant to 42 U.S.C. § 1988; and

D. Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

Jack M. Stephens (La. Bar No. 41468)
Emily M. Washington (La. Bar No. 34143)
James W. Craig, T.A. (La. Bar No. 33687)
Roderick and Solange MacArthur Justice Center
4400 S. Carrollton Ave.
New Orleans, LA 70119
Phone: 504-620-2259
Fax: 504-208-3133
emily.washington@macarthurjustice.org
jim.craig@macarthurjustice.org
jack.stephens@macarthurjustice.org

*Attorneys for Plaintiff*

Dated: September 4, 2026