**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF LOUISIANA**

TODD WESSINGER,

Plaintiff,

v. Civil Action No. 3:26-cv-957-JWD-SDJ

GARY WESTCOTT, et al.,

Defendants.

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS FIRST AMENDED COMPLAINT**

## I. INTRODUCTION

Plaintiff Todd Wessinger brings this civil action under 28 U.S.C. § 1983, seeking temporary, preliminary, and permanent injunctive relief forbidding Defendants Gary Westcott, Secretary of the Louisiana Department of Public Safety and Corrections ("DPSC"), Seth Smith, DPSC's Chief of Operations, and Darrel Vannoy, Warden of the Louisiana State Penitentiary (collectively, "Defendants") from executing him by administering either nitrogen asphyxiation or lethal injection using the drugs midazolam and hydromorphone.[1] These two methods of execution are authorized by Louisiana statute[2] and DPSC's Department Regulation No. OP-D-8 ("Execution Protocol" or "2026 Protocol") (most recently amended October 27, 2026).[3]

---

[1] First Amended Complaint for Declaratory and Injunctive Relief ("FAC"), ECF No. 28. All Defendants are sued in their official capacity. Id. at 6-8, ¶¶ 27, 31, 35.
[2] La. R.S. 15:569(A).
[3] FAC at 1-2, ¶¶ 3-4 (citing Execution Protocol).

As they did with respect to Plaintiff's original Complaint, Defendants move to dismiss the First Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(1).[4] They assert that this Court lacks jurisdiction because (1) suit against these Defendants in their official capacity is barred by sovereign immunity, (2) Plaintiff lacks standing to bring this action in light of the declarations of Secretary Westcott which purport to permit Plaintiff to elect to be executed by a lethal dose of pentobarbital, and (3) should Plaintiff refuse to make this election, this civil action should be construed as a second or successive petition for writ of habeas corpus, over which this Court lacks original jurisdiction.

All three of Defendants' arguments are premised on Secretary Westcott's declarations. But nothing in these documents changes the duties imposed on the secretary by Louisiana statute or the duties delegated by him to Chief Smith and Warden Vannoy with respect to carrying out Louisiana law in accordance with the Execution Protocol. These well-defined statutory and operational responsibilities, as pleaded in the First Amended Complaint, plainly establish that all three Defendants have a "sufficient connection to enforcement" as required under Ex parte Young, 209 U.S. 123 (1908).

Similarly, nothing in the declarations deprives this civil action of justiciability. The declarations cannot nullify Louisiana law, under which it is Secretary Westcott, not Todd Wessinger, who has the duty to determine the method by which Plaintiff will be executed.[5] Nor are the declarations a binding statement of "voluntary cessation" of allegedly unconstitutional action sufficient to render this lawsuit moot. Rather, as in cases where the Fifth Circuit has refused

[4] ECF No. 30 ("2d MTD") and ECF No. 30-1 ("2d MTD Mem."). The motion to dismiss is supported by two declarations from Defendant Gary Westcott. ECF Nos. 30-2 ("Westcott Decl. 1") and 30-3 ("Westcott Decl. 2").
[5] La. R.S. 15:569(A)-(B).

to dismiss for mootness, "there is no controlling statement of future intention, the change in conduct is suspiciously timed, and the defendant continues to defend the challenged behavior."[6]

Finally, nothing in the declarations transforms this § 1983 civil action into a petition for writ of habeas corpus. The Supreme Court has made clear that a civil lawsuit seeking an injunction against a jurisdiction's method of execution cannot be considered a habeas corpus petition.[7]

Thus, this Court should deny Defendants' 12(b)(1) motion to dismiss and lift the stay on discovery entered by the Court on October 21, 2026.[8]

## II. FACTS RELEVANT TO THE MOTION TO DISMISS

Plaintiff Todd Wessinger was convicted of two counts of first-degree murder and sentenced to death.[9] On August 18, 2026, the United States Court of Appeals for the Fifth Circuit reversed the grant of habeas relief to Mr. Wessinger by the U.S. District Court for the Middle District of Louisiana and remanded the case to the district court with instructions to enter final judgment denying the petition.[10]

Secretary Westcott is the chief executive officer of DPSC, establishes and administers the policies and procedures of DPSC, and oversees the administration of its affairs.[11] Under Louisiana law, "[t]he secretary of the Department of Public Safety and Corrections, or a competent person selected by him, shall execute the offender in conformity with the death warrant issued in the case."[12] Further, Louisiana law requires the DPSC Secretary to select between the statutorily-

---

[6] Netflix, Inc. v. Babin, 88 F.4th 1080, 1089-90 (5th Cir. 2023).
[7] Nance v. Ward, 597 U.S. 159 (2022).
[8] Minute Entry and Order, ECF No. 24, at 2. See generally Motion to Stay Discovery, ECF No. 20 ("Stay Mot.") and Memorandum in Support of Motion to Stay Discovery, ECF No. 20-1 ("Stay Mem."). Plaintiff responded to this motion, Memorandum in Opposition to Motion to Stay Discovery, ECF No. 23 ("Opp. Stay").
[9] Wessinger v. Vannoy, 187 F.4th 339, 342 (5th Cir. 2026).
[10] Id.
[11] FAC at 5-6, ¶¶ 21-25.
[12] Id. at 6, ¶ 24; La R.S. 15:568.

authorized execution methods to direct how an individual prisoner's sentence of death will be carried out.[13]

Significantly, unlike Alabama and certain other states, Louisiana law does not provide the condemned prisoner with an option between execution methods which would bind DPSC.[14] And even in the states with an election provision in their statutes, the laws provide for a default method in the event the prisoner makes no election. For example, in Alabama, Ala. Code § 15-18-82 says in pertinent part, "the sentence shall be executed . . . by lethal injection unless the convict elects execution by electrocution or nitrogen hypoxia as provided by law."[15] Thus, even those states that provide an opportunity for election do not "force" that decision on the condemned prisoner – the selection of method remains with the state, absent affirmative action by the prisoner.

Defendant Smith is responsible for the technical implementation of Louisiana's execution procedures, including the development of the nitrogen-hypoxia system and Defendants' ongoing oversight of its implementation.[16] And Defendant Vannoy oversees the institution where executions take place and is responsible for implementing DPSC's execution procedures and managing preparations for executions.[17]

---

[13] FAC at 6, ¶¶ 25-5; La. R.S. 15:569(A)-(B). La. R.S. 15:569(A) provides that "At the discretion of the secretary of the Department of Public Safety and Corrections and with no preference to the method of execution, every sentence of death shall be by one of the following methods" (1) lethal injection, (2) nitrogen hypoxia, or (3) electrocution." La. R.S. 15:569(B) provides that, "Upon receipt of the warrant commanding the secretary to cause the execution of the person condemned as provided by law, the secretary shall, within seven days, provide written notice to the condemned person of the manner of execution."

[14] See Price v. Comm'r, Dept. of Corr., 920 F.3d 1317, 1324 (11th Cir. 2019) (citing Ala. Code § 15-18-82.1(b)(2)).

[15] The process of election is further described in Ala. Code § 15-18-82.1(a) and (b) as follows: "(a) A death sentence shall be executed by lethal injection, unless the person sentenced to death affirmatively elects to be executed by electrocution or nitrogen hypoxia. The sentence shall be executed pursuant to Section 15-18-82; (b) A person convicted and sentenced to death for a capital crime at any time shall have one opportunity to elect that his or her death sentence be executed by electrocution or nitrogen hypoxia."

[16] FAC at 7, ¶¶ 28-30.

[17] Id. at 7, ¶¶ 32-34.

## III. REASONS TO DENY THE MOTION TO DISMISS

### A. Defendants' assertions of sovereign immunity are plainly without merit, given that they are charged with carrying out executions in Louisiana.

#### 1. *Defendants Westcott, Smith, and Vannoy meet the requirements of Ex parte Young and are thus properly sued for prospective injunctive relief in their official capacities.*

Defendants assert that they "are state officials sued in their official capacities and are therefore entitled to sovereign immunity unless Plaintiff can satisfy the Ex parte Young exception."[18] As the Fifth Circuit has recently reaffirmed, "under the rule of Ex parte Young, 209 U.S. 123 (1908), 'a federal court may enjoin a state official in his official capacity from taking future actions in furtherance of a state law that offends federal law or the federal Constitution.'"[19] The Court of Appeals explained:

> For a suit against a state official to proceed under Ex parte Young, three criteria must be satisfied: (1) A plaintiff must name individual state officials as defendants in their official capacities; (2) the plaintiff must allege an ongoing violation of federal law; and (3) the relief sought must be properly characterized as prospective.[20]

Defendants do not dispute or even mention these criteria. Where, as here, they are satisfied, "the issue is whether the officials [plaintiff has] sued are proper defendants."[21] A state official is a proper defendant in a suit for prospective injunctive relief, and therefore not shielded by sovereign immunity, where the official has "some connection with the enforcement of" the challenged law.[22]

---

[18] 2d MTD Mem. at 5 (citing Tex. Democratic Party v. Abbott, 978 F.3d 168, 179 (5th Cir. 2020)).
[19] Healthy Vision Assn. v. Abbott, 138 F.4th 385, 396 (5th Cir. 2025) (citing Ex parte Young, 209 U.S. 123 (1908) and quoting Moore v. La. Bd. of Elementary & Secondary Educ., 743 F.3d 959, 963 (5th Cir. 2014)).
[20] Healthy Vision, 138 F.4th at 396 (citing Green Valley Special Util. Dist. v. City of Schertz, 969 F.3d 460, 471 (5th Cir. 2020) (en banc) (quoting Raj v. La. State Univ., 714 F.3d 322, 328 (5th Cir. 2013), and Verizon Md., Inc. v. Pub. Serv. Comm'n, 535 U.S. 635, 645 (2002)) (cleaned up).
[21] Healthy Vision, 138 F.4th at 396 (citing Book People, Inc. v. Wong, 91 F.4th 318, 334–35 (5th Cir. 2024)).
[22] Healthy Vision, 138 F. 4th at 396 (citing Mi Familia Vota v. Ogg, 105 F.4th 313, 325 (5th Cir. 2025) and quoting Ex parte Young, 209 U.S. at 157); Jackson v. Wright, 82 F.4th 362, 367 (5th Cir. 2023).

The requisite enforcement connection need not be substantial: even a "scintilla of enforcement" is sufficient.[23]

Corrections officials with responsibility for selecting execution methods and administering state laws and procedures for carrying out executions have repeatedly been sued in their official capacity under Ex parte Young without any courts raising issues regarding sovereign immunity.[24] Defendants do not dispute that they have substantial responsibility for carrying out executions in Louisiana. Instead, they suggest that Secretary Westcott's declaration creates a one-time scenario which disconnects them from responsibility for administering capital punishment to Plaintiff.

In this context, Defendants rely on language in Fifth Circuit opinions which identify three "guideposts" to assist district courts in determining whether Defendants' connection with enforcement of the challenged law is sufficient under Ex parte Young: whether an official (1) has a particular duty to enforce the challenged law, rather than merely a generalized duty to enforce state law; (2) demonstrates a willingness to exercise that duty; and (3) exercises authority that compels or constrains compliance with the challenged law.[25]

These guideposts are not ends unto themselves, as Defendants would have it; rather, they serve the ultimate inquiry into whether an official possesses the requisite enforcement

---

[23] Tex. Democratic Party v. Abbott, 978 F.3d 168, 179 (5th Cir. 2020) (quoting City of Austin v. Paxton, 943 F.3d 993, 1002 (5th Cir. 2019)).
[24] See, e.g., Hoffman v. Westcott, No. 25-169-SDD-SDJ, 2025 WL 763945, at *12 (M.D. La. Mar. 11, 2025) (Dick, J.) (granting preliminary injunction against Secretary Westcott and Warden Vannoy in Eighth Amendment challenge to nitrogen hypoxia), vacated, Hoffman v. Westcott, 131 F.4th 332 (5th Cir. 2025) (vacating injunction on Eighth Amendment grounds without addressing sovereign immunity); Nance v. Ward, 597 U.S. 159 (2022) (entertaining method-of-execution challenge against state corrections commissioner and prison warden in their official capacities); Bucklew v. Precythe, 587 U.S. 119 (2019) (adjudicating method-of-execution challenge against state corrections director, director of adult institutions, and prison warden); Glossip v. Gross, 576 U.S. 863 (2015) (adjudicating method-of-execution challenge against state corrections director, prison warden, and corrections board members).
[25] MTD Mem. at 5 (citing Mi Familia Vota v. Ogg, 105 F.4th 313, 325 (5th Cir. 2024)).

connection.[26] Indeed, the Fifth Circuit has cautioned that the demonstrated-willingness guidepost "must not be understood so rigidly as to thwart its orienting purpose."[27]

Importantly, these guideposts have developed principally in cases challenging the constitutionality of statutes after their enactment but before their enforcement. In such cases, the threshold question is which state officials, if any, are responsible for enforcing the challenged statutory provisions. In Texas Democratic Party, for example, the plaintiffs challenged a Texas statute restricting eligibility for absentee voting, and the Fifth Circuit examined whether the Governor, Attorney General, and Secretary of State possessed sufficient enforcement authority over the particular provision at issue. The court concluded that the Secretary was a proper defendant because her statutory responsibilities over absentee-ballot applications enabled her to compel or constrain local election officials, whereas the Governor and Attorney General lacked the requisite connection.[28] Similarly, in Mi Familia Vota, the court considered whether a district attorney's generalized prosecutorial authority sufficiently connected her to election-law provisions that she had neither enforced nor threatened to enforce. The court held that it did not.[29] These decisions thus address the difficulty of identifying an official whose authority to enforce a challenged statutory provision is sufficiently direct to permit prospective relief against that official.

That difficulty is largely absent where, as here, the alleged constitutional violation consists of affirmative governmental conduct carried out by identifiable officials. In that context, the relevant inquiry is whether the defendants possess authority over the challenged conduct and can be enjoined from carrying it out. Indeed, the Fifth Circuit has repeatedly applied Ex parte Young

[26] Mi Familia Vota, 105 F. 4th at 330 (explaining that the guideposts "help ensure" that a defendant has the connection required by Ex parte Young); Jackson, 82 F.4th at 367-68 (expressly limiting its analysis to the two guideposts it deemed "relevant" and finding a sufficient enforcement connection without separately applying the additional guideposts).
[27] Healthy Vision Ass'n v. Abbott, 138 F.4th 385, 398 (5th Cir. 2025).
[28] Texas Democratic Party, 978 F.3d at 179-81.
[29] Mi Familia Vota, 105 F.4th at 325-32.

to challenges involving prison conditions and correctional practices. In Valentine v. Collier, the court held that the executive director of Texas's corrections department and a prison warden were proper defendants because they possessed authority over the creation and implementation of the challenged prison policies.[30]

Likewise, in Hope v. Harris, the court expressly applied the compel-or-constrain requirement to officials responsible for maintaining allegedly unconstitutional conditions of confinement. Notably, it observed that "all institutional litigation involving state prisons" generally proceeds under Ex parte Young, explaining that "[t]he exception is so well established [in that context]" that such cases often do not even "mention[] . . . Ex parte Young."[31] These cases illustrate that the requisite connection exists where officials possess authority to implement, maintain, or prevent the affirmative governmental conduct alleged to violate federal law.

Here, there can be little question that Defendants possess the requisite connection to the challenged methods of execution. Plaintiff does not challenge a novel statutory prohibition enforced by some uncertain set of state actors. He challenges Louisiana's intended use of nitrogen hypoxia to execute him, and he has sued the three officials principally responsible for determining and carrying out that execution. Secretary Westcott is statutorily charged with selecting the method of execution.[32] Defendant Smith is responsible for the technical implementation of Louisiana's execution procedures, including the development of the nitrogen-hypoxia system and Defendants'

---

[30] Valentine v. Collier, 993 F.3d 270, 280 (5th Cir. 2021).

[31] Hope v. Harris, 861 F. App'x 571, 578 (5th Cir. 2021) (quoting Brennan v. Stewart, 834 F.2d 1248, 1252 n.6 (5th Cir. 1988)).

[32] FAC at 6, ¶¶ 23-24; La. R.S. 15:569(A)-(B). La. R.S. 15:569(A) provides that, "At the discretion of the secretary of the Department of Public Safety and Corrections and with no preference to the method of execution, every sentence of death shall be by one of the following methods:" (1) lethal injection, (2) nitrogen hypoxia, or (3) electrocution. La. R.S. 15:569(B) provides that, "Upon receipt of the warrant commanding the secretary to cause the execution of the person condemned as provided by law, the secretary shall, within seven days, provide written notice to the condemned person of the manner of execution."

ongoing oversight of its implementation.[33] Defendant Vannoy oversees the institution where executions take place and is responsible for implementing DPSC's execution procedures and managing preparations for executions.[34] Their statutory responsibilities, operational authority, and prior testimony establish far more than a generalized connection to the challenged conduct.

Ultimately, Secretary Westcott's declaration does not interrupt the nexus between his legal responsibilities and the challenged methods of execution; rather, it corroborates that he personally exercises the authority to determine Defendants' method of Plaintiff's execution, including the authority to select either nitrogen hypoxia or lethal injection as methods and to direct DPSC personnel accordingly. The question is not, as Defendants have framed it, whether Mr. Wessinger can "Identify Any Compulsion or Constraint to Execute Him by Nitrogen Hypoxia," but whether Defendants possess the requisite authority over the challenged execution methods.

Defendants' post-filing creation of an unprecedented "election" procedure unauthorized by Louisiana law or Department regulations, the implementation of which would necessarily implicate all three Defendants' responsibilities, confirms what was already clear: they control the conduct challenged here. That demonstrated authority more than satisfies Ex parte Young's sufficient-connection requirement.

**2. *Plaintiff is not required to choose a preferred method of execution and has not done so.***

As required by Supreme Court and Fifth Circuit jurisprudence,[35] Plaintiff has pled that the substantial risk of serious harm threatened by the nitrogen hypoxia and midazolam-hydromorphone methods set forth in DPSC's Execution Protocol would be reduced or eliminated

---

[33] FAC at 6-7, ¶¶ 28-29.
[34] Id. at ¶¶ 31–32.
[35] Baze v. Rees, 553 U.S. 35, 52 (2008) (plurality op. of Roberts, C.J.); Glossip v. Gross, 576 U.S. 863, 877-78 (2015); Bucklew v. Precythe, 587 U.S. 119, 139-40 (2019); Barr v. Lee, 591 U.S. 979 (2020); Nance v. Ward, 597 U.S. 159 (2022); Hoffman v. Westcott, 131 F.4th 332 (5th Cir. 2025); Whitaker v. Collier, 862 F.3d 490 (5th Cir. 2017).

by using a lethal dose of pentobarbital instead. Defendants' arguments, including their assertion of sovereign immunity, are premised on the notion that these allegations are equivalent to a choice by Plaintiff to be executed with pentobarbital. Plaintiff has made no such choice; nor does Louisiana law permit, let alone require, him to do so.[36] Defendants' argument distorts the Eighth Amendment's focus on the decisions of the corrections officials, not those of the prisoner.

Plaintiff's Complaint alleges that "Single-drug pentobarbital is a feasible and readily implemented alternative that would significantly reduce the substantial risk of severe harm presented by execution through nitrogen hypoxia or the two-drug midazolam and hydromorphone series."[37] It further explains:

> The use of a single dose of pentobarbital compounded by a duly licensed compounding pharmacy, administered under appropriate safeguards as described below in paragraphs 110 through 112, is a feasible and readily implemented alternative to execution by nitrogen hypoxia that would significantly reduce the substantial risk of severe pain presented by Louisiana's nitrogen-hypoxia procedure.[38]

In Baze, the Supreme Court grounded its method-of-execution analysis in Farmer v. Brennan, a seminal case which established that prison officials violate the Eighth Amendment only when they knowingly disregard a substantial risk of serious harm.[39] In the execution context, the Court explained that determining whether officials possess this requisite level of subjective culpability requires examining whether they refuse to adopt a feasible, readily implemented alternative that would significantly reduce the substantial risk of severe pain presented by the challenged method:

---

[36] See, supra, at 4 and nn. 14-15.
[37] FAC at 3, ¶ 9.
[38] Id. at 29-30, ¶ 108. See also id. at 29-33, ¶¶ 108-121; id. at 33-34, ¶¶ 122-138; id. at 37-38, ¶¶ 140-142; id. at 39, ¶150.
[39] Id. at 50 (citing Farmer v. Brennan, 511 U.S. 825, 842, 846, and n.9 (1994)). The Chief Justice's plurality opinion in Baze was adopted by the majority in Glossip, 576 U.S. at 867, 876-77.

> If a State refuses to adopt such an alternative in the face of these documented advantages, without a legitimate penological justification for adhering to its current method of execution, then a State's refusal to change its method can be viewed as "cruel and unusual" under the Eighth Amendment.[40]

The Eighth Amendment standard of Baze and Glossip was further developed in Bucklew, Barr, and Nance. Under Bucklew, "a prisoner must show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason."[41] The Bucklew Court characterized this as "a necessarily comparative exercise"[42] and reasserted that "[a]s we've explained, the alternative-method requirement is compelled by our understanding of the Constitution, not by mere policy concerns."[43]

Under this comparative analysis, the focus is on the choices available to the corrections officials, not any election or choice purportedly offered to the prisoner. Claiming that Plaintiff has "chosen pentobarbital" may make for a snappy social media post,[44] but it distorts the point of the Eighth Amendment: is a governmental official inflicting cruel and unusual punishment on a prisoner in their custody?

It is for purposes of this necessary comparison that the First Amended Complaint describes the safeguards "necessary for an execution by single-drug pentobarbital to most effectively mitigate or reduce the risks created by nitrogen hypoxia":

> (a) testing the pentobarbital for integrity, purity, potency, and absence of endotoxins by a laboratory unaffiliated with a compounding pharmacy or a department of corrections, and

[40] Baze, 553 U.S. at 52.
[41] Bucklew, 587 U.S. at 134.
[42] Bucklew, 587 U.S. at 136 (emphasis in original). See also Nance, 597 U.S. at 164 ("[o]nly through a 'comparative exercise,' we have explained, can a judge 'decide whether the State has cruelly 'superadded' pain to the punishment of death'") (quoting Bucklew, 587 U.S. at 136).
[43] Id. at 137.
[44] Jeff Landry (@LAGovJeffLandry), X (Oct. 19, 2026, at 11:30 CT), https://x.com/LAGovJeffLandry/status/2112219965403402434.

providing the results of the testing to the prisoner's counsel and the Court;

(b) examining the prisoner in advance of the execution date to assess the prisoner's veins for successful IV access;

(c) implementing standards for qualification, current and independent certification, experience, and training of all personnel on the execution team who insert the intravenous catheters, administer the drugs, and monitor the injection process, including that no central femoral venous line shall be used unless the person placing the line is currently certified or licensed within the United States to place a central femoral line;

(d) requiring that the personnel responsible for securing IV access continue to monitor the prisoner during the injection process for signs of swelling or infiltration at the IV site, blood in the catheter, and leakage from the lines, unusual resistance as the drugs are being pushed via the syringe(s), and other unusual signs or symptoms of intravenous infiltration;

(e) requiring the execution to be halted if (i) successful IV access is not secured after one hour of attempts, (ii) the first dose of pentobarbital fails to cause death, or (iii) any other part of the process shows signs of distress and/or pain; (f) opening curtains or other obstructions to viewing the execution process from before IV access is attempted through to the declaration of death;

(g) permitting the prisoner's counsel to be a witness to the execution, with access to communications services in the event the Court must be contacted during the execution process; and

(h) other similar safeguards used in jurisdictions to prevent a botched or torturous execution by lethal injection.[45]

---

[45] FAC at 30-31, ¶ 112. Defendants acknowledge this language and cite the First Amended Complaint's allegations that "DPSC has already adopted procedures governing execution by single-drug pentobarbital" that "would significantly reduce the substantial risk of severe pain and serious harm presented by nitrogen hypoxia," FAC ¶ 128, and that "[u]se of DPSC's current single-drug pentobarbital protocol would significantly reduce the risk posed by both nitrogen hypoxia and the two-drug midazolam-and-hydromorphone series. Compl. ¶ 11." See 2d MTD Mem. at 8 n.1 (italicized emphasis in Defendants' brief). Plaintiff's pleading is properly rooted in the required Eighth Amendment analysis: the question posed by prong two of the Baze/Glossip/Bucklew analysis is whether there exists "a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." Bucklew, 587 U.S. at 134. The First Amended Complaint alleges, in the language quoted by Defendants and elsewhere, that DPSC includes a single-dose pentobarbital method in its Execution Protocol; this addresses the existence and feasibility of an alternative to nitrogen asphyxiation. The FAC further alleges, in the language quoted by Defendants in Paragraph 112 and elsewhere in the pleading, that this alternative significantly reduces the substantial risk of severe pain posed using nitrogen gas in executions. This all relates to the comparative analysis required by the jurisprudence and has nothing to do with any "choice" by Plaintiff or any other condemned person.

To be sure, as in Alabama, Louisiana state law could provide condemned prisoners with one or more execution methods specified as alternatives to the statute's default method; under those circumstances, the prisoner's election, or the default method if the prisoner makes no election, would then be binding on the state.[46] But Louisiana has not done so. The Complaint's pleading of one-drug pentobarbital as a known, available alternative to either nitrogen asphyxiation or the midazolam-hydromorphone injection is a means by which this Court must decide if the method chosen and implemented by these Defendants constitutes cruel and unusual punishment. The decision how to execute Todd Wessinger is, and will remain, in the hands of these Defendants.

The Complaint's satisfaction of Plaintiff's obligation to plead a known, available alternative to the two challenged execution methods does not in any way change the fact that Defendants Westcott, Smith, and Vannoy have far more than a scintilla of responsibility for the selection and administration of one of the statutorily authorized methods of execution and therefore are properly sued in their official capacity under Ex parte Young.

**B. Plaintiff has standing to challenge the methods of execution set forth in Defendants' Execution Protocol unless and until Defendants demonstrate that they cannot elect to execute Plaintiff by nitrogen hypoxia or by lethal injection using the midazolam-hydromorphone combination.**

There can be no serious dispute that Plaintiff has standing in this case. Defendants themselves acknowledge that Plaintiff "will soon be duly executed."[47] Defendant Westcott is authorized to execute Plaintiff by, among other methods, nitrogen asphyxiation and midazolam-hydromorphone injection.[48] Defendants freshly amended protocol includes both challenged methods, and Defendants have recently expended significant effort in constructing a mechanism

---

[46] See, supra, at 4 and nn.14-15 (discussing Ala. Code § 15-18-82 and 15-18-82.1(a) and (b)).
[47]2d MTD Mem. at 1.
[48] FAC at 8-11, ¶¶ 39-45; Westcott Decl. 1 at 1 ¶ 5 ("Pursuant to La. R.S. 15:569(A), I am responsible for selecting the manner of execution that will be used to carry out a death sentenced imposed. Therefore, I will be responsible for selecting the manner of execution for Plaintiff Todd Wessinger.").

and procedure for execution by nitrogen gas.[49] On March 18, 2025, Defendants executed Jessie Hoffman using nitrogen asphyxiation.[50] And Secretary Westcott has testified in this case that "in general, I will choose nitrogen hypoxia over lethal injection or electrocution."[51] Plaintiff thus faces a substantial risk of injury directly traceable to Defendants, which would be redressed by an injunction prohibiting the challenged methods. Nothing about Secretary Westcott's newly announced "election" procedure strips Plaintiff of standing.

The three standing authorities upon which Defendants rely are entirely inapposite, and therefore do nothing to undermine this conclusion. Unlike in Clapper, where the plaintiffs failed to establish that the Government would use newly enacted statutory authority to intercept their communications, Defendants here have already employed nitrogen hypoxia and expressly stated their preference for that method.[52] Unlike in Murthy, where the plaintiffs' alleged injuries depended on the independent actions of third-party social media platforms, Plaintiff here seeks to enjoin the very officials responsible for his threatened injury.[53] And unlike in Zimmerman, where the plaintiff voluntarily refrained from lawful conduct to avoid a speculative risk of prosecution, Plaintiff here has taken no voluntary action to manufacture the threatened injury.[54] Defendants, not Plaintiff, control how he will be executed, and cannot transform the threatened injury into a "self-inflicted" one merely by offering, after this lawsuit was filed, a conditional and non-binding means of avoiding it.

In reality, Defendants' argument is not that Plaintiff has failed to allege facts sufficient to establish standing, but that Secretary Westcott's post-Complaint declarations constitute an

---

[49] FAC at 11-12, ¶¶ 46-51.
[50] Id. at 21, ¶ 86.
[51] Westcott Decl. 1 at 3 ¶ 7.
[52] Clapper v. Amnesty Int'l USA, 568 U.S. 398, 410-14 (2013).
[53] Murthy v. Missouri, 603 U.S. 43, 57 (2024).
[54] Zimmerman v. City of Austin, 881 F.3d 378, 389-90 (5th Cir. 2018).

intervening decision that forecloses the prospect of a constitutional rights violation. But "[i]t is the doctrine of mootness, not standing, that addresses whether 'an intervening circumstance [has] deprive[d] the plaintiff of a personal stake in the outcome of a lawsuit.'"[55] "The distinction matters because the Government, not [plaintiffs], bears the burden to establish that a once-live case has become moot."[56]

This Court has acknowledged the basic principles of the voluntary cessation doctrine as established by the Supreme Court:

> It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice. If it did, the courts would be compelled to leave the defendant free to return to his old ways. In accordance with this principle, the standard we have announced for determining whether a case has been mooted by the defendant's voluntary conduct is stringent: A case might become moot if subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur. The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness.[57]

It is Defendants' burden to establish mootness by voluntary cessation,[58] and they have made no effort to carry that burden here.[59] As noted above, Secretary Westcott's "election" procedure is

---

[55] West Virginia v. EPA, 597 U.S. 697, 719 (2022) (alterations and emphasis in original) (quoting Genesis HealthCare Corp. v. Symczyk, 569 U.S. 66, 72 (2013)). This Court should, in denying the motion to dismiss and lifting the stay of discovery, specifically find that Defendants' arguments sounded in mootness, not in a valid invocation of sovereign immunity.

[56] West Virginia v. EPA, 597 U.S. at 719 (citing Friends of the Earth, Inc. v. Laidlaw Environmental Services (TOC), Inc., 528 U.S. 167, 189 (2000)); Adarand Constructors, Inc. v. Slater, 528 U.S. 216, 222 (2000) (per curiam)).

[57] Nelson v. Landry, 714 F.Supp.3d 790, 804-805 (M.D. La. 2024) (quoting Friends of the Earth, Inc. v. Laidlaw Env't Servs., Inc., 528 U.S. 167, 189 (2000)).

[58] See Tucker v. Gaddis, 40 F.4th 289, 292-93 (5th Cir. 2022) ("[Defendant] bears the "heavy" burden of demonstrating mootness") (citing Pederson v. La. State Univ., 213 F.3d 858, 874 (5th Cir. 2000); id. at 295-96 (Ho, J., concurring) (emphasizing that defendants seeking dismissal based on voluntary cessation bear a "'stringent' and 'formidable' burden" and that excusing the government's failure to provide assurances against recurrence would "make a mockery" of that burden).

[59] Plaintiffs have twice previously briefed the centrality of the voluntary cessation doctrine to Defendants' arguments, see Plaintiff's Memorandum in Opposition to Defendants' Motion to Stay Discovery, ECF No. 23 at 6-8, and Plaintiff's Opposition to Defendants' Motion to Dismiss, ECF No. 26 at 11-17. The Court acknowledged these arguments during the October 21, 2026, status conference. Minute Entry and Order, ECF No. 24 at 2 ("[t]he Court also raised its concern

contrary to Louisiana statutory law and jurisprudence and has no basis in the regulations of the Louisiana Department of Public Safety and Corrections. Thus, there is no legal requirement that Secretary Westcott honor any "election" made by Plaintiff or any other condemned prisoner. As a result, there is no certainty that any "election" by Plaintiff would be legally enforceable against Defendants should they decide to employ nitrogen hypoxia after all. The most that counsel for Defendants could offer was the representation (without any supporting legal basis) that "the declaration is legally binding if pentobarbital is available."[60]

That defendants remained free to reverse course was precisely the concern underlying the Supreme Court's decision in FBI v. Fikre. There, the Court unanimously held that the government's removal of the plaintiff from the No Fly List, followed by a sworn declaration promising not to relist him based on currently available information, did not moot his constitutional challenge. The Court emphasized that "'[t]he Constitution deals with substance,' not strategies," and warned that a more forgiving rule would permit defendants to suspend challenged conduct after being sued, secure dismissal, and subsequently resume that conduct.[61] As the Court noted, "[a] live case or controversy cannot be so easily disguised, and a federal court's constitutional authority cannot be so readily manipulated."[62] The Court found the government's declaration insufficient because it did not foreclose relisting the plaintiff for engaging in the same or similar conduct in the future.[63] Of particular relevance to this case, the Court rejected the government's speculation about the plaintiff's future behavior as a substitute for assurances about its own conduct, emphasizing that

---

that nothing binds the State to its promise that Plaintiff may elect to use pentobarbital, which again ties directly to mootness and the arguments made in Defendants' Motion to Dismiss"). By failing to meet their "stringent and formidable burden" to show that their proposed voluntary cessation moots Plaintiff's case, Defendants have forfeited their standing argument. Parker v. La. Dept. of Pub. Safety and Corr., No. 18-1030, 2020 WL 4353564 at *8 (M.D. La. July 29, 2020) (failing to brief mootness in their original motion forfeited argument).

[60] Minute Entry and Order, ECF No. 24, at 2.

[61] FBI v. Fikre, 601 U.S. 234, 241 (2024).

[62] Id.

[63] Id. at 242.

the burden remains on the defendant to demonstrate that the challenged conduct cannot reasonably be expected to recur.[64]

Similarly, the Fifth Circuit has held that Texas prison officials' post-filing revision of a policy prohibiting certain religious gatherings did not moot a prisoner's RLUIPA challenge, stating:

> But the government has not even bothered to give Tucker any assurance that it will permanently cease engaging in the very conduct that he challenges. To the contrary, as noted, counsel for TDCJ stated precisely the opposite during oral argument—TDCJ would *not* guarantee congregation in the future, but instead would reserve the question in light of potential "time, space, and security concerns." If anything, it is far from clear that the government has ceased the challenged conduct *at all*, let alone with the permanence required under the "stringent" standards that govern the mootness determination when a defendant claims voluntary compliance. For each of these reasons, this case cannot possibly be moot.[65]

Judge Ho noted in concurrence, "This standard is strict because courts are naturally suspicious—or at least they <u>should</u> be—of officials who try to avoid judicial review by voluntarily mooting a case. The skepticism is warranted because the opportunities and incentives for government defendants are obvious: Any defendant could engage in unlawful conduct, stop when sued to have the case declared moot, then pick up where he left off, repeating this cycle until he achieves all his unlawful ends."[66] He continued, "This burden is not insurmountable, to be sure. If a government not only ceases the challenged behavior but also assures the plaintiffs and the courts that it will *never* return to its previous course of conduct, a court might reasonably decide to credit

---

[64] <u>Id.</u> at 243. Importantly, too, the Court emphasized that this burden "holds for governmental defendants no less than for private ones." <u>Id.</u> at 241.
[65] <u>Tucker v. Gaddis</u>, 40 F.4th 289, 292-93 (5th Cir. 2022).
[66] <u>Id.</u> at 295-96 (Ho, J. concurring) (emphasis in original).

that promise, and hold the case moot, so long as it finds no reason to doubt the government's credibility on this score."[67]

Further, in Netflix, Inc. v. Babin, the Fifth Circuit held that a prosecutor's post-filing dismissal of an indictment without prejudice and adoption of a conditional non-prosecution policy did not moot Netflix's constitutional challenge. The court explained that although governmental defendants receive "some solicitude" under the voluntary cessation doctrine, the presumption of good-faith cessation is defeated where "there is no controlling statement of future intention, the change in conduct is suspiciously timed, and the defendant continues to defend the challenged behavior."[68] Each of these considerations is present here.

First, Secretary Westcott's declaration is not a controlling statement of future intention. Louisiana law commits the decision as to method of execution to the secretary.[69] The decision is made "within seven days" of issuance of the execution warrant.[70] As Secretary Westcott himself acknowledges, "I have not received an active warrant commanding the execution of Plaintiff, so no method of execution has been selected for Plaintiff's execution."[71] And the Secretary further declares that "in general, I will choose nitrogen hypoxia over lethal injection or electrocution."[72]

Moreover, at the October 21, 2026, status conference, Defendants' counsel expressly qualified the purported commitment to pentobarbital, representing that "the declaration is legally binding if pentobarbital is available" and that the State does not currently have pentobarbital on hand.[73] Beyond the admittedly premature and conditional nature of these representations, there is

[67] Id.
[68] Netflix, Inc. v. Babin, 88 F.4th 1080, 1089-90 (5th Cir. 2023).
[69] La. R.S. 15:569(A).
[70] La. R.S. 15:569(B).
[71] Westcott Decl. 1 at 3 ¶ 6.
[72] Id. at 3 ¶7.
[73] Minute Entry and Order, ECF No. 24 at 2. Plaintiff has requested the transcript of the October 21, 2026, status conference.

no requirement under Louisiana law that Secretary Westcott honor any "election" by Plaintiff if this lawsuit is dismissed, and Defendants have identified no means of recourse which Plaintiff could use if the Secretary exercised his statutory discretion contrary to any such "election." In sum, Secretary Westcott's declaration provides no binding assurance that Defendants will refrain from executing Plaintiff with either of the methods he has properly challenged.[74]

This same concern was addressed earlier this year in Pizzuto v. Derrick, a methods-of-execution challenge in Idaho. There, Idaho had enacted legislation making the firing squad its primary method of execution, permitting lethal injection only if the firing squad is unavailable. Pursuant to this change, the state moved to dismiss a condemned prisoner's § 1983 case challenging the lethal injection protocol. The court declined to find the case moot, reasoning that "intentions change" and that "[i]f there are any complications around the firing range, it remains entirely plausible that IDOC could turn to lethal injection again."[75] The same reasoning applies here.[76]

[74] Additionally, Secretary Westcott's declaration does not apply generally to all death-sentenced prisoners under a warrant of execution. The Fifth Circuit decisions affording governmental defendants solicitude, discussed by this Court in Nelson, 714 F. Supp. 3d at 804-06, involved formal, generally applicable policy changes. See Sossamon v. Lone Star State of Texas, 560 F.3d 316, 325-26 (5th Cir. 2009) (statewide administrative directive revised); Freedom From Religion Found., Inc. v. Abbott, 58 F.4th 824, 834 (5th Cir. 2023) (regulation formally repealed). Neither resembles Secretary Westcott's individualized, conditional promise in a suspiciously timed (post-Complaint) declaration, unaccompanied by any generally applicable change to governing law, regulations, or official policy that constrains his discretion. It therefore cannot be considered a "formally announced change" that could potentially moot this case. Nelson, 714 F. Supp. 3d at 804-06. Additionally, Nelson was decided before the Supreme Court's opinion in Fikre, which discarded the entire notion of "affording governmental defendants solicitude," holding instead that the same burden to show voluntary cessation "holds for governmental defendants no less than for private ones." Fikre, 601 U.S. at 241.

[75] Pizzuto v. Derrick, No. 21-359, 2026 WL 353433 (D. Idaho Feb. 6, 2026).

[76] Similarly, any claim that DPSC does not have the drugs necessary to employ the midazolam-hydromorphone combination does not moot Plaintiff's challenge to that method. As the Fifth Circuit held in a case involving Mississippi's lethal injection protocol, "Mississippi asserts that, as it no longer has pentobarbital and is currently unable to obtain more, there is no live controversy regarding pentobarbital and the issue is moot. Because other states retain access to pentobarbital it seems possible that Mississippi could regain access in the future. We are reluctant to conclude the issue is moot because we are not convinced 'subsequent events [have] made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" Jordan v. Fisher, 823 F.3d 805, 809 n.4 (5th Cir. 2016) (citing Laidlaw); Chase v. Cain, No. 15-295, 2025 WL 2313223 at *7 (S.D. Miss., Aug. 11, 2025) (citing Jordan and Laidlaw).

The second and third considerations in Netflix—that the government's change in position was adopted after suit is filed, and that the government continues to defend the challenged behavior—apply equally here.[77] Secretary Westcott's declaration was signed on October 16, 2026, and filed on October 19—over a month after the filing of this civil action. And the declaration makes clear that Defendants continue to defend the use of nitrogen asphyxiation. The secretary says, "Having personally witnessed an execution via nitrogen hypoxia, I saw that it was humane, and in general, I will choose nitrogen hypoxia over lethal injection or electrocution. . . . [Plaintiff's] factual and legal claims about nitrogen hypoxia are wrong."[78]

In conclusion, Secretary Westcott's declaration does not moot Plaintiff's civil action, nor does it deprive Plaintiff of standing to bring this case.

**C. This § 1983 civil action is not a second or successive petition for habeas corpus.**

Defendants make a convoluted assertion that, if Plaintiff fails to "elect" lethal injection via pentobarbital on Secretary Westcott's non-binding, unauthorized, and extra-legal form, the Complaint can be considered a second or successive habeas petition. This argument is directly contrary to the Supreme Court's opinion in Nance v. Ward.[79] It is abundantly clear that the Complaint in this case does not seek to prohibit Defendants from executing Plaintiff, but rather to prohibit Defendants from executing Plaintiff by nitrogen asphyxiation or the midazolam-hydromorphone combination. That is cognizable in a civil action pursuant to 28 U.S.C. § 1983.

Defendants accuse Plaintiff of "gamesmanship,"[80] but they are the parties who have created an unenforceable sham "process"—in effect, a game—by which they hope to secure dismissal of

[77] Netflix, 88 F.4th at 1089-90.
[78] Westcott Decl. at 3 ¶7.
[79] Nance v. Ward, 597 U.S. 159 (2022).
[80] 2d MTD Mem. at 14.

this lawsuit. Plaintiff has asked this Court to enjoin Defendants from executing him by nitrogen hypoxia or midazolam-hydromorphone injection. If Defendants agree that such an injunction can be issued, then proceedings in this Court can swiftly be concluded. Absent that, this civil action presents a case or controversy over which this Court has jurisdiction.

## IV. CONCLUSION

Plaintiff respectfully requests that the Court deny the motion to dismiss.

Respectfully submitted,

*/s/ Emily Washington*

Emily M. Washington (La. Bar No. 34143)
James W. Craig (La. Bar No. 33687)
Jack M. Stephens (La. Bar No. 41468)
Roderick and Solange MacArthur Justice Center
4400 S. Carrollton Ave., New Orleans, LA 70119
Phone: 504-620-2259
Fax: 504-208-3133
emily.washington@macarthurjustice.org
jim.craig@macarthurjustice.org
jack.stephens@macarthurjustice.org

*Counsel for Plaintiff*

Dated: November 8, 2026